**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
Alex J. Tramontano (#276666)
1091 North Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com
Email: ajt@rl-legal.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL LEE, Derivatively on Behalf of Nominal Defendant WEBTOON ENTERTAINMENT INC.,<br><br>Plaintiff,<br><br>v.<br><br>JUNKOO KIM, DAVID J. LEE, NANCY DUBUC, NAMSUN KIM, HAEJIN LEE, JUN MASUDA, and ISABELLE WINKLES,<br><br>Defendants,<br><br>and<br><br>WEBTOON ENTERTAINMENT INC.,<br><br>Nominal Defendant. | Case No. ______________<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Lee ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant WEBTOON Entertainment Inc. ("Webtoon" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge

as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: a review of Defendants' publicly available documents; conference call transcripts and announcements made by Defendants; filings with the United States Securities and Exchange Commission ("SEC"); press releases published by and regarding Webtoon; legal filings; news reports; securities analysts' reports about the Company; filings in the securities class action captioned *Brookman v. Webtoon Ent. Inc. et al.*, No. 2:24-cv-07553-CBM-RAO (C.D. Cal.) (the "Securities Class Action"); and other publicly available information.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought by Plaintiff on behalf of Webtoon against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least June 27, 2024, through August 8, 2024, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Webtoon is a global entertainment company and home to some of the world's largest storytelling platforms. Founded by Defendant J Kim in 2005, Webtoon and its subsidiaries provide spaces for both creators and users to discover, create, and share content like stories, fan fictions, and webcomics. On June 27, 2024, the Company announced its initial public offering ("IPO") on the NASDAQ Global Select Market ("NASDAQ").

3. Because Webtoon was previously a private company without proven

[1] Individual Defendants are JunKoo Kim ("J Kim"), David J. Lee ("D Lee"), Nancy Dubuc ("Dubuc"), Namsun Kim ("N Kim"), Haejin Lee ("H Lee"), Jun Masuda ("Masuda"), and Isabelle Winkles ("Winkles"). The Individual Defendants, together with Webtoon, are "Defendants."

profitability, the Company's newly issued public stock's value was heavily dependent upon how investors perceived the Company's future growth potential, including its expected user numbers and revenue growth trends. To garner support and increase its appeal to the investing public, Webtoon included in its Registration Statement (defined below) that the Company had, among other things, great potential for growth, stating that the Company was a "high-growth startup," and that, as of the time of the IPO, it was experiencing "rapid growth in [its] business and revenue," and that the Company's monthly active users ("MAU") metric was large and stable. Webtoon's MAU metric was an especially important measure of the Company's performance in this industry; thus, the Company assessed its MAU trends on a daily, weekly, and monthly basis.

4. The Company's Registration Statement signaled that Webtoon's business and revenue prospects were strong, and touted the Company's ability to quickly achieve profitability. However, in reality, Webtoon's MAU growth was declining year-over-year, the Company had lost millions of MAU leading up to the IPO, the Company was adversely affected by weak foreign currencies, and the Company's revenue growth had halted by the time of the IPO.

5. The truth was revealed on August 8, 2024, when the Company issued a press release discussing the Company's financial results for the second quarter of 2024 (the "2Q24 Press Release"). The 2Q24 Press Release reported, among other things, disappointing second quarter results, including, among other things, a substantial decline in MAU, which had suffered a multi-million user decline from what was reported in the Registration Statement six weeks prior. The 2Q24 Press Release also indicated that the deterioration in MAU contributed to the reported 3.7% and 3.6% declines in the Company's IP Adaptation and Advertising revenue streams, respectively. The Company further reported flat year-over-year revenue

growth for the second quarter of 2024.

6. On this news, the Company's stock price declined $7.88 per share, or approximately 38.2%, from a closing price of $20.63 per share on August 8, 2024, to a closing price of $12.75 per share on August 9, 2024.

7. Throughout the Relevant Period, Company leadership issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) the Company's MAU numbers were not stable or growing, but diminishing during the period leading up to the IPO; (ii) Webtoon's MAU trends were not indicative of the Company's future performance at the time of the IPO, in violation of SEC disclosure rules; (iii) the Company was experiencing declines in multiple of its revenue streams at the time of the IPO, negatively impacting the Company's operations; (iv) Webtoon already faced significant risks related to currency fluctuations because of its reliance on weak foreign currencies; (v) many of the risks the Company stated in its Registration Statement were not hypothetical, but had already materialized and were adversely impacting the Company; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself, and potentially incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

9. Moreover, in light of the breaches of fiduciary duty by the Individual

Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)) and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78u-4(f)).

11. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Webtoon maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

16. Plaintiff is, and has been at all relevant times, a shareholder of Webtoon.

***Nominal Defendant***

17. Nominal Defendant Webtoon is incorporated under the laws of Delaware, with its principal executive offices located at 5700 Wilshire Boulevard, Suite 220, Los Angeles, California 90036. Webtoon common stock trades on the NASDAQ under the ticker symbol "WBTN."

***Individual Defendants***

18. Defendant J Kim is the founder of Webtoon and has served as the Company's Chief Executive Officer ("CEO") and as a director since September 2016. Defendant J Kim is named as a defendant in the Securities Class Action. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 23, 2025 (the "2025 Proxy"), Defendant J Kim received $44,095,031 in total compensation from the Company in 2024.

19. Defendant D Lee has served as director of the Company since 2024, and as the Company's Chief Financial Officer ("CFO"). Defendant D Lee previously served as the Company's CFO and Chief Operating Officer from November 2023 to April 2026. D Lee has also served as President of Wattpad Corp., a subsidiary of Webtoon, since April 2026. Defendant D Lee is named as a defendant in the Securities Class Action. According to the 2025 Proxy, Defendant D Lee received $6,132,051 in total compensation from the Company in 2024.

20. Defendant Dubuc has served as a director of the Company since May 2024. Defendant Dubuc also serves as a member of the Company's Audit Committee and Compensation Committee. Defendant Dubuc is named as a defendant in the Securities Class Action. According to the 2025 Proxy, Defendant Dubuc received $510,103 in total compensation from the Company in 2024.

21. Defendant N Kim has served as a director of the Company since May 2024. Defendant N Kim also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. Defendant N Kim is named as a defendant in the Securities Class Action.

22. Defendant H Lee has served as a director of the Company since October 2020. Defendant H Lee also serves as Chair of the Company's Compensation Committee. Defendant H Lee is named as a defendant in the Securities Class Action.

23. Defendant Masuda has served as a director of the Company since October 2020. Defendant Masuda also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Masuda is named as a defendant in the Securities Class Action.

24. Defendant Winkles has served as a director of the Company since April 2024. Defendant Winkles also serves as Chair of the Company's Audit Committee. Defendant Winkles is named as a defendant in the Securities Class Action. According to the 2025 Proxy, Defendant Winkles received $517,569 in total compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25. By reason of their positions as officers and/or directors of Webtoon, and because of their ability to control the business and corporate affairs of Webtoon, the Individual Defendants owed Webtoon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Webtoon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Webtoon and its shareholders.

26. Each director and officer of the Company owes to Webtoon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Webtoon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28. To discharge their duties, the officers and directors of Webtoon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the

management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Webtoon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

31. To discharge their duties, the officers and directors of Webtoon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Webtoon were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Webtoon's own Code of

Ethics;

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Webtoon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Webtoon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Webtoon' operations would comply with all applicable laws and Webtoon' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company

and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

32. Each of the Individual Defendants further owed to Webtoon and the shareholders the duty of loyalty requiring that each favor Webtoon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

33. At all times relevant hereto, the Individual Defendants were the agents of each other and of Webtoon and were at all times acting within the course and scope of such agency.

34. Because of their advisory, executive, managerial, and directorial positions with Webtoon, each of the Individual Defendants had access to adverse, non-public information about the Company.

35. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Webtoon.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

36. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

37. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the

Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

38. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

39. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Webtoon, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

40. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

41. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Webtoon, and at all times operated within the course and scope of that agency.

## WEBTOON'S CODE OF ETHICS

42. According to the Company's Code of Ethics, "[a]ll directors, officers and employees are required to be familiar with the Code [of Ethics], comply with its provisions and report any suspected violations . . . ."

43. The Company's Code of Ethics states that its purpose is to:

> [D]eter wrongdoing and promote:
>
> 1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> 2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
>
> 3. compliance with applicable governmental laws, rules and regulations;
>
> 4. protection of the Company assets, including corporate opportunities and confidential information;
>
> 5. fair dealing practices;
>
> 6. the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and
>
> 7. accountability for adherence to the Code.

44. Under a section titled "Honest and Ethical Conduct," the Code of Ethics states, in relevant part:

> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in their dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom they have contact in the course of performing their job.

45. Under a section titled "Conflicts of Interest," the Code of Ethics states, in relevant part:

> A conflict of interest occurs when an individual's private interest (or the interests of a member of their family) interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director (or a member of their family) takes actions or has interests that may make it difficult to perform their work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of their family) receives improper personal benefits as a result of their position in the Company. . . .
>
> Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized . . . .

> Directors and executive officers must seek determinations and prior authorizations or approvals of potential conflicts of interest exclusively from the Audit Committee of the Board . . . .

46. Under a section titled "Corporate Opportunities," the Code of Ethics states, in relevant part:

> All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and employees may not use Company property, information or position for personal gain. In addition, no director, officer or employee may compete with the Company.

47. Under a section titled "Fair Dealing," the Code of Ethics states, in relevant part:

> Each director, officer and employee must deal fairly with the Company's customers, suppliers, competitors, partners, service providers, employees and anyone else with whom they have contact in the course of performing their job. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

48. Under a section titled "Compliance," the Code of Ethics states, in relevant part:

> Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates.
>
> Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. . . .
>
> Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

49. Under a section titled "Disclosure," the Code of Ethics states, in relevant part:

> The Company's periodic reports and other documents filed with the

> SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.
>
> Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.
>
> Each director, officer and employee who is involved in the Company's disclosure process must:
>
> 1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
>
> 2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

50. Under a section titled "Reporting and Investigation of Violations," the Code of Ethics states, in relevant part:

> Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee. . . .
>
> After receiving a report of an alleged prohibited action, the Audit Committee, the General Counsel or the relevant supervisor must promptly take all appropriate actions necessary to investigate.
>
> All directors, officers and employees are expected to cooperate in any internal investigation of misconduct.

## <u>**WEBTOON'S AUDIT COMMITTEE CHARTER**</u>

51. Pursuant to Webtoon's Audit Committee Charter, the Audit Committee's purpose is

> [T]o oversee the accounting and financial reporting process of WEBTOON Entertainment Inc. (the "<u>Company</u>") and the audits of the Company's financial statements.
>
> In fulfilling its purpose, the Audit Committee is responsible for maintaining free and open communication between itself and the independent auditor, internal auditor function and management of the Company, and for determining that all parties are aware of their responsibilities.

> The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements, determining that they are complete, accurate, and in accordance with U.S. generally accepted accounting principles ("GAAP") and establishing satisfactory disclosure controls and internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

52. Under the section titled "Duties and Responsibilities," the Audit Committee Charter tasks the Audit Committee with the following authority and responsibilities, among others:

> 7. Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K (the "Form 10-K" ) or quarterly report on Form 10-Q (the "Form 10-Q"), as applicable.
>
> 8. Risk Oversight: To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.
>
> 9. Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Form

10-K.

10. Quarterly Financials: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-Q before the Form 10-Q is filed.

11. Earnings Releases: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

12. Financial Statements Issues: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements. . . .

16. Audit Committee Report: To produce the audit committee report required to be included in the Company's proxy statement, and review the disclosure in the Company's proxy statement regarding the Audit Committee. . . .

20. Code of Ethics: To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.

21. Related Party Transactions: To (1) review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) on an ongoing basis, in accordance with Company policies and procedures, including the Company's Related Party Transactions Policy; (2) keep the Company's independent auditor informed of the Audit Committee's understanding of the Company's relationships and transactions with related parties that are significant to

the Company and whether any member of the Audit Committee has concerns regarding relationships or transactions with related persons and, if so, the substance of those concerns; and (3) review and discuss with the Company's independent auditor the independent auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

22. Legal Compliance: To (1) review, with the General Counsel and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; (2) review the Company's compliance with applicable laws and regulations; and (3) review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

## SUBSTANTIVE ALLEGATIONS

***Background***

53. Webtoon is a global entertainment company and home to some of the world's largest storytelling platforms. Founded by Defendant J Kim in 2005, Webtoon and its subsidiaries provide spaces for both creators and users to discover, create, and share content like stories, fan fictions, and webcomics. By the time of the IPO, Webtoon had purportedly grown to be the leading webcomic provider in each of the Company's three major geographies, including the Republic of Korea ("Korea"), the United States, and Japan, as well as a major player in the Southeast Asian and European markets.

54. To track the Company's growth, Webtoon looks at certain "key metrics," including, among others, MAU, Monthly Paid Users ("MPU") and Paid Content Average Revenue Per Paying User ("ARPPU"). MAU includes users who visited Webtoon's offerings at least once in the relevant calendar month, averaged over each month in each period, and reflected the size of the Company's user base and consumer demand. As the Company indicated, Webtoon "track[s] MAU as an indicator of the scale of our active user base, user engagement and adoption." MPU includes users who paid to access Webtoon's "Paid Content," which the Company

reviews as an "indicator[] of the strength of [the Company's] monetization." ARPPU looks at the conversion of MAU to MPU, and Webtoon utilizes the metric as "an indicator of both the strength of engagement and Paid Content monetization."

55. Webtoon assesses its growth through analyzing MAU, MPU, and ARPPU. The Company's key monetization strategy is premised upon attracting an expansive, broad MAU, enticing those users to remain on Webtoon's platforms, and convert non-paying MAU to MPU. Thus, as the Company stated, "[t]he size of our user base and our users' level of engagement are critical to our success, and ***our financial performance has been, and will continue to be, significantly determined by our success in retaining, attracting and engaging MAU and converting them into MPU***."[2]

56. In addition to generating revenue from Paid Content, the Company also derives revenue from two other streams: Advertising and Intellectual Property ("IP") Adaptations. While Paid Content provides the majority of the Company's revenue, the Company also indicated it was poised for growth in the Advertising and IP Adaptations segments.

57. On May 31, 2024, the Company filed its registration statement on Form S-1 with the SEC (the "Initial S-1"). On June 17, 2024, the Company filed its final amendment to the registration statement with the SEC on Form S-1/A (the "S-1/A"). On June 27, 2024, the Company filed its final prospectus on Form 424B4 with the SEC, which is also part of the Company's registration statement (the "Prospectus," and together with the Initial S-1 and S-1/A, the "Registration Statement"). The Registration Statement was signed by Individual Defendants and was declared effective on June 26, 2024.

58. Pursuant to the Securities Act and SEC's rules and regulations, the

[2] Unless otherwise stated, all emphasis is added.

Company was required to disclose in the Registration Statement known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on Webtoon's continuing operations.

***Materially False and Misleading Statements During the Relevant Period***

59. When discussing the Company's monthly active users, the Registration Statement disclosed "Trends in Monthly Active Users," which emphasized that the Company's MAU key metric "ha[s] ***demonstrated durable and consistent growth*** across regions."

60. The Registration Statement further stated that the Company had accelerated year-over-year growth in Global MAU for the four quarters immediately preceding the IPO, as represented in the following graph:




61. The Registration Statement also repeatedly stressed the stability the Company was experiencing with its MAU numbers. According to the Registration Statement, at the time of the IPO, the Company's Global MAU had "scaled" and "***stabilized*** to reach approximately 170 million" MAUs. In discussing the Korea segment, the Company's "largest and most mature market" in terms of MAU

penetration, the Company recorded 24.7 million MAU as of the quarter immediately preceding the IPO, representing 4.4% in year-over-year growth in Korea. As the Registration Statement indicated the "[Korea MAU] ***display[ed] a generally stable trend*** with modest fluctuations."

62. When discussing the Global MAU, the Registration Statement represented that "[s]tarting from the third quarter of 2023, we observed ***rebound of our MAU, driven by organic user growth*** and a clear focus on prioritizing our core markets. . . . This sets the stage for ***significant opportunities to drive user growth***."

63. When discussing the Company's revenue prospects, the Registration Statement highlighted Webtoon's 2023 total revenue growth of 19% year-over-year, stating that "[revenue] growth was driven by our Paid Content Business, advertising in Japan, and successful IP Adaptations in Korea." As the Company stated in the Registration Statement, the year-over-year growth came as the Company's "strategic adjustments to ***focus on core business and prioritize [its] core markets had stabilized, and operations returned to normal***," following a "modest" decline in total revenue in the third quarter of 2023.

64. The Registration Statement also highlighted the Company's "substantial" opportunity for "***growing our Paid Content revenue by attracting more users***, driving higher engagement and paying ratio, ***and increasing our average paid content per paying user (ARPPU)***." The Company further emphasized that "***total monthly Paid Content ARPPU has increased over time*** as our users explored more titles and purchased more episodes behind our paywall."

65. Moreover, the Registration Statement stated that the average amount spent on the Company's paid content, stating that "the average user spent $11.5[0] on Paid Content [ARPPU] per month in the quarter ended March 31, 2024," which made that quarter a more successful one in the Company's ARPPU metric over the

last two years. The trend disclosed in the Registration Statement indicated that the Company had experienced sustained year-over-year growth in ARPPU for the five quarters preceding the IPO, peaking at $11.50 per month the quarter immediately prior to the IPO, as demonstrated in the following graph included in the Registration Statement:




66. The Registration Statement further touted the Company's "high-intent, sought-after user base attracts advertisers," and claimed that the Company's growth strategies included "***[a]ccelerat[ing] the growth of our advertising business*** by enhancing our advertising products and reaching new advertisers." Moreover, according to the Registration Statement, the Company stated that "we believe that we will be able to increase advertising revenue as we continue to innovate our advertising products and capture an increasing portion of the $680 billion digital advertising market globally," and that "***growth in advertising revenue will come from both existing advertising partners already on our platform, as well as acquisition of new advertising partners as we expand our advertising products***."

67. The Registration Statement also highlighted the Company's monetization methods, stating that "[w]e currently generate a substantial majority of our revenues from Paid Content distribution. . . . ***We plan to strengthen revenue contribution from our other monetization methods***, such as monetizing content on our platform via adaptations into film, streaming series and other rich media formats." The Registration Statement also stated that there was "a significant additional market opportunity" in the Company's IP Adaptations business, and

claimed that as the Company's "library continues to grow, and we continue to invest in the capabilities to produce IP Adaptations . . . ***we can capture an increasing portion of the over $900 billion global entertainment industry***." The Registration Statement also acknowledged that "[e]ven though we are in the early stage of our adaptation business and have a limited experience in generating substantial revenues from such adaptations, ***we believe we can further diversify our monetization strategy through IP Adaptations***."

68. The Registration Statement also addressed the Company's exposure to foreign currency fluctuations on its business stating, in relevant part:

> Our revenue is generated globally in multiple currencies, primarily the Korean won, Japanese yen and U.S. dollar. Our results of current and future operations and cash flows are therefore subject to fluctuations due to changes in foreign currency exchange rates. ***As the impact of foreign currency exchange rates has not been material to our historical operating results***, we have not entered into derivative or hedging transactions, but we may do so in the future if our exposure to foreign currency becomes more significant.

69. The Registration Statement also discussed risks to the Company as hypothetical even though they had already materialized. For example, under a section titled "Risks Related to Our Business, Industry and Operations," the Registration Statement stated, in relevant part:

> Our growth may decline in the future as a result of a variety of factors, ***including slowing demand for our platform, insufficient growth in the number of creators and users that use our platform***, increased competition, insufficient growth of our overall market, our inability to continue to capitalize on growth opportunities, increasing regulatory costs and the maturation of our business. We believe that the growth of our business depends on a number of factors, including our ability to:
>
> - continue to attract and empower creators to create engaging content;
> - attract users and strengthen our brands;
> - increase engagement with users and strengthen our community;
> - increase our paying ratio and strengthen our monetization capability;
> - continue to innovate and expand our advertising business;
> - increase revenues from our IP Adaptations with increasing bargaining power vis-a-vis third-party intellectual property adaptation partners (e.g., studios, publishers, financiers, distributors,

> producers and potential buyers);
> - expand our presence into new geographic markets;
> - continue to innovate our platform; and
> - maintain sales and marketing efficiency.
>
> We may not successfully accomplish any of these objectives, or such changes may not be favorable to us, and, as a result, it is difficult for us to forecast our future results of operations. If the assumptions that we use to plan our business are incorrect or change in reaction to changes in our market, ***or if we are unable to maintain revenue growth***, our stock price could decline, it may be difficult to achieve and maintain profitability and our business, financial condition and results of operations could be adversely affected.

70. The Registration Statement further represented risks in losing users as hypothetical when it had already materialized stating that "[a]ny future declines in our user base ***may*** adversely impact our financial performance."

71. The Registration Statement also represented exposure to non-U.S. currencies and their fluctuations as a hypothetical risk, even though this risk had already materialized, stating, in relevant part:

> As we continue to expand our international operations, we become more exposed to the effects of fluctuations in currency exchange rates. We incur expenses for employee compensation and other operating expenses at our non-U.S. locations in local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of our expenses being higher, which may not be offset by additional revenue earned in the local currency. This ***could*** have a negative impact on our reported results of operations.

72. Moreover, the Registration Statement failed to disclose negative events, trends, and uncertainties that it was required to disclose pursuant to SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303") and SEC Regulation S-K, 17 C.F.R. § 299.105 ("Item 105"). Item 105 and Item 303 impose independent and affirmative disclosure obligations for companies undergoing public offerings. Thus, companies undergoing an IPO are obligated to disclose known adverse trends that were occurring at the time of the IPO. Failure to comply with these disclosure obligations is considered an independent violation of the Securities Act.

73. The Registration Statement stated that Webtoon's MAU had

"stabilized," "scaled," and "rebound[ed]," and that the Company's MAU "ha[s] ***demonstrated durable and consistent growth across regions***." However, in actuality, the Company's MAU was in a state of decline by the time of the IPO, as demonstrated in the chart below, which was not disclosed in the Registration Statement.




74. The Registration Statement also claimed "durable and consistent growth" in Webtoon's MAU. However, in actuality, the Company's Global MAU growth had declined by the time of the IPO, as demonstrated in the chart below. This negative growth trend that was occurring by the time of the IPO was not disclosed in the Registration Statement.




75. The Registration Statement also reported that the Company's Rest of World MAU had "rebound[ed]" and "entered a period of stabilization." However, as shown in the chart below, the Rest of World MAU saw a quarterly decline to the lowest quarterly MAU level in full period, another adverse trend that was occurring by the time of the IPO that was not revealed in the Registration Statement.



76. Furthermore, similarly to the Global MAU, the Rest of World MAU's growth had halted and shifted downward by the time of the IPO, as demonstrated in the chart below. This also was not revealed in the Registration Statement.




77. The Registration Statement also failed to disclose that Webtoon's ARPPU was experiencing a downward trend by the date of the IPO, only reporting its peak of $11.50, as shown in the chart below.



78. The Registration Statement also failed to disclose that quarter-over-quarter ARPPU growth trends had declined by the time of the IPO, as demonstrated in the chart below.




79. The Registration Statement similarly omitted critical information about the declining trends in the foreign currencies Webtoon relied upon. As the Company indicated in the Registration Statement, it heavily relied upon the foreign currencies of Korean Won (₩) and Japanese Yen (¥) whose fluctuations in value posed a risk to the Company. At the time of the IPO, both the Won and Yen were experiencing significant deterioration compared to the U.S. Dollar, as demonstrated in the charts below.







80. The Registration Statement also failed to disclose how the above-mentioned undisclosed trends would negatively impact the Company's revenue growth numbers as the above negative trends were known to the Individual Defendants at the time of the IPO. Webtoon omitted in the Registration Statement statements indicating that the known unfavorable negative trends occurring by the time of the IPO would have a materially adverse impact on the Company's reported

revenue, which remained flat as was disclosed *after* the IPO.

81. The statements detailed above in ¶¶ 59-71, 73-80 were materially false and misleading when made because they failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company's MAU numbers were not stable or growing, but diminishing during the period leading up to the IPO; (ii) Webtoon's MAU trends were not indicative of the Company's future performance at the time of the IPO, in violation of SEC disclosure rules; (iii) the Company was experiencing declines in multiple of its revenue streams at the time of the IPO, negatively impacting the Company's operations; (iv) Webtoon already faced significant risks related to currency fluctuations because of its reliance on weak foreign currencies; (v) many of the risks the Company stated in its Registration Statement were not hypothetical, but had already materialized and were adversely impacting the Company; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Is Revealed***

82. The truth emerged on August 8, 2024, when the Company issued the 2Q24 Press Release. The 2Q24 Press Release reported disappointing second quarter results, including bleak revenue growth and substantial declines in MAU and a deterioration of the "approximately 170 million" Global MAU, which had suffered a multi-million user decline from what was reported in the Registration Statement six weeks prior. Global MAU was reported at 166.3 million, the lowest quarterly level in over a year, and a reduction of four quarters worth of growth in Webtoon's user base. The 2Q24 Press Release also indicated that the deterioration in MAU

contributed to the reported 3.7% and 3.6% declines in the Company's IP Adaptation and Advertising revenue streams, respectively. The Company also reported flat year-over-year revenue growth for the second quarter of 2024.

83. On the same day, the Company issued a letter to shareholders appended to its Form 8-K filed with the SEC (the "Shareholder Letter"). In the Shareholder Letter, the Company revealed a 5.7% decline in ARPPU in Japan, a 10% decline in ARPPU in Korea, and overall revenue decline in Korea of 19.3%, primarily driven by decreases in Paid Content and Advertising revenue. As a result, the Company reported a $0.30 decline in ARPPU for the quarter, dropping the metric down to $11.20 per month, the lowest it had been in five quarters.

84. Also on August 8, 2024, the Company hosted an earnings call for analysts and investors to discuss the Company's results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant D Lee revealed that the Company's "reported revenue was roughly flat year over year." Defendant D Lee also revealed that Global MAU suffered as the Company experienced "softer overall user dynamics in the quarter as [Korea] MAU of 23.2 million decreased 6.6% year over year."

85. Defendant J Kim further stated during the 2Q24 Earnings Call that the Company's ARPPU had experienced a decline "driven by the[] delays" in the pre-IPO launch of an artificial intelligence-powered recommendation tool, continued to be delayed at the time of the IPO, and which extended into the second half of the year.

86. On this news, the Company's stock price declined $7.88 per share, or approximately 38.2%, from a closing price of $20.63 per share on August 8, 2024, to a closing price of $12.75 per share on August 9, 2024.

87. Analysts immediately reacted to the corrective disclosures issued by the

Company on August 8, 2024. As one analyst remarked, "WBTN's 2Q results . . . did not have strong upside," attributing the stock decline to "***weaker than expected 2Q revenue of $321mm (flat YoY), -6% below consensus $341mn.***" The miss was also attributed to "***strong US $ against KRW and JPY***," and "***weak revenue growth on FX***." Analysts also indicated that Webtoon's "***MAU was weaker than expected***," and that the market "reacted negatively to the ***weak MAU trend*** which was down -0.8% YoY with Korea -6.6% YoY." A Deutsche Bank analyst likewise attributed the decline in Webtoon's stock price to "FX headwinds and underperformance in Korea," as well as lower-than-expected MAU.

***The Securities Class Action***

88. As a result of the Individual Defendants' misconduct, the Securities Class Action was filed on September 5, 2024, against, among others, the Company and Individual Defendants in the United District Court for the Central District of California. On February 3, 2025, the plaintiffs in the Securities Class Action filed the Consolidated Complaint. Securities Class Action, ECF No. 60.

89. On March 4, 2025, defendants in the Securities Class Action filed a motion to dismiss the Consolidated Complaint (the "MTD"). *Id.*, ECF Nos. 61-64.

90. On November 14, 2025, the court in the Securities Class Action entered an Order and Opinion denying the MTD, in part. *Id.*, ECF No. 77. On December 2, 2025, the court in the Securities Class Action entered an amended Order and Opinion denying the MTD, in part (the "MTD Order"). *Id.*, ECF No. 82.

91. The MTD Order held that plaintiffs had made plausible claims under Sections 11 and 15 of the Exchange Act for the majority of the alleged materially false and misleading statements. MTD Order at 18. Notably, the court held that allegations "regarding the durability, consistency, stability, and growth potential of Webtoon's Monthly Active Users ("MAU")," were sufficiently plead to withstand a

Rule 12(b)(6) motion to dismiss. *Id.* at 4–11. The MTD Order also held that the alleged misstatements in the Registration Statement's risk disclosures were sufficiently alleged as "false or misleading." *Id.* at 12.

92. Moreover, with respect to plaintiffs' claims of violations of relevant SEC regulations promulgated under Section 11 of the Exchange Act, the MTD Order held that plaintiff "pleads sufficient facts to state a claim under Item 303." *Id.* at 17.

93. Additionally, regarding plaintiffs' Section 15 claims, the MTD Order held that plaintiff "pleads sufficient facts that the individual defendants are control persons to state a claim under Section 15 of the [Exchange] Act." *Id.*

***Harm to the Company***

94. As a direct and proximate result of the Individual Defendants' misconduct, Webtoon has lost and expended, and will lose and expend, millions of dollars.

95. Such expenditures include, but are not limited to, (i) the legal fees associated with the Securities Class Action filed against the Company and the Individual Defendants; (ii) amounts paid to outside lawyers, accountants, and investigators in connection therewith; and significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96. Furthermore, the Securities Class Action has exposed the Company to potential massive class-wide liability.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

97. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

98. Webtoon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99. Plaintiff is a current shareholder of Webtoon and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

100. A pre-suit demand on the Board of Webtoon is futile and, therefore, excused. At the time this action was commenced, the nine-member Board was comprised of Defendants J Kim, H Lee, N Kim, Masuda, D Lee, Winkles, and Dubuc (the "Director Defendants") and non-parties Saeju Jeong ("Jeong") and Yongsoo Kim ("Y Kim," together with Jeong and Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

101. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

102. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross

negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

103. Moreover, the Directors willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

104. Defendant J Kim is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, J Kim serves as the Company's CEO and Chairman of the Board. Thus, as conceded by the proxy statement filed by the Company on Schedule 14A with the SEC on April 22, 2026 (the "2026 Proxy"), Defendant J Kim is a non-independent director.

105. Defendant D Lee is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, D Lee serves as the Company's CFO and President of the Company's subsidiary Wattpad Corp. Thus, as conceded by the 2026 Proxy, Defendant D Lee is a non-independent director.

106. Defendants H Lee and N Kim are not disinterested or independent and are therefore incapable of considering a demand. In addition to serving as a director, H Lee and N Kim are representatives of NAVER, the Company's majority stockholder. Thus, as conceded in the 2026 Proxy, Defendants H Lee and N Kim are non-independent directors.

107. Defendant Masuda is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Masuda is a representative of LY Corporation, one of the Company's significant stockholders. Thus, as conceded in the 2026 Proxy, Defendant Masuda is a non-independent director.

108. Non-party Y Kim is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Y Kim is the Company's President. Thus, as conceded by the 2026 Proxy, Y Kim is a non-independent director.

109. Furthermore, all of the Director Defendants are named as defendants, and therefore face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

110. Defendants Winkles and Dubuc serve on the Company's Audit Committee (the "Audit Defendants")[3] and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

111. The Director Defendants, as members of the Board, were and are subject to the Company's Integrity Policy. The Integrity Policy goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Integrity Policy because they

---

[3] Non-party Jeong also serves on the Audit Committee.

knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Integrity Policy, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

112. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

113. Moreover, none of the Directors have taken remedial action to redress the conduct alleged herein.

114. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

115. The acts complained of herein constitute violations of fiduciary duties owed by Webtoon' officers and directors, and these acts are incapable of ratification.

116. Thus, for all of the reasons set forth above, the Directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants For Breach of Fiduciary Duties

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

119. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

120. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) the Company's MAU numbers were not stable or growing, but diminishing during the period leading up to the IPO; (ii) Webtoon's MAU trends were not indicative of the Company's future performance at the time of the IPO, in violation of SEC disclosure rules; (iii) the Company was experiencing declines in multiple of its revenue streams at the time of the IPO, negatively impacting the Company's operations; (iv) Webtoon already faced significant risks related to currency fluctuations because of its reliance on weak foreign currencies; (v) many of the risks

the Company stated in its Registration Statement were not hypothetical, but had already materialized and were adversely impacting the Company; (vi) the Company failed to maintain adequate internal controls; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

122. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

123. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

124. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

125. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

126. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants For Aiding and Abetting Breach of Fiduciary Duty

127. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

129. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants For Unjust Enrichment

130. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Webtoon.

132. The Individual Defendants either benefitted financially from the

improper conduct, or received bonuses, stock options, or similar compensation from Webtoon that were tied to the performance or artificially inflated valuation of Webtoon, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

133. Plaintiff, as a shareholder and a representative of Webtoon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

134. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets Against the Individual Defendants

135. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

137. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and collecting excessive compensation and bonuses and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

138. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

139. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Contribution Under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f))**

140. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141. As a result of the misconduct alleged above, the Company is a defendant in the Securities Class Action, in which it is a joint tortfeasor in claims brought under Section 11 and 15 of the Securities Act.

142. Federal law provides Webtoon with a cause of action against other alleged tortfeasors under Section 11(f) of the Securities Act.

143. The plaintiffs in the Securities Class Action allege that the Registration Statement, filed with the SEC in connection with the Company's IPO, contained numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

144. Webtoon is the registrant for the IPO, and the Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

145. As the issuer of the shares, Webtoon is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged therein.

146. The plaintiffs in the Securities Class Action allege that none of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and not misleading.

147. The Individual Defendants, because of their position of control and authority as officers and directors of Webtoon, were able to, and did, directly and/or

indirectly, exercise control over the business and corporate affairs of Webtoon, including the wrongful acts complained of herein and in the Securities Class Action.

148. Accordingly, the Individual Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

149. As such, Webtoon is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

150. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Webtoon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions.

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 5, 2026

**RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*
Gina M. Serra (#361172)
Alex J. Tramontano (#276666)
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Facsimile: (302) 654-7530
Email: gms@rl-legal.com
Email: ajt@rl-legal.com

*Attorneys for Plaintiff*